**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHEMAINE BULL o/b/o DANIEL J. GROGAN, <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security, <br><br> Defendant. | Case No.:  2:17-cv-07484 (PAZ) <br><br> **OPINION** |

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
PO BOX 1798
RAHWAY, N.J.  07065
        On behalf of Plaintiff

MARGARET WINSLOW REED
SOCIAL SECURITY ADMINISTRATION
300 SPRING GARDEN STREET
6TH FLOOR
PHILADELPHIA, P.A.  19123
        On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Daniel J. Grogan for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401,

et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying

the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

On July 29, 2012, Plaintiff filed an application for DIB alleging a disability onset date of December 31, 2009.  (R. 49, 137-38.)[2]  On January 30, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 49.)  Plaintiff filed for reconsideration, and on March 26, 2014, the application was again denied.  (R. 68.)  On November 18, 2015, an Administrative Law Judge held a hearing on Plaintiff's application; Plaintiff was represented by counsel at the hearing.  (R. 26-48.)  At the hearing, Plaintiff amended the alleged onset date to March 28, 2014.  (R. 11, 31.)  On February 12, 2016, the ALJ issued a decision denying Plaintiff's application.  (R. 8-25.)  On July 26, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-5), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  On September 26, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On May 2, 2018, Plaintiff consented to have a U.S. Magistrate Judge

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy A. Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  In April 2018, Ms. Berryhill resumed her role as Acting Commissioner.  *Patterson v. Berryhill*, No. 18-cv-193 (DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); *see* 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record on appeal.  ECF No. 5.

conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 9.[3] The case was reassigned to the undersigned Magistrate Judge on March 28, 2019. ECF No. 23.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the

record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

**B.**    **Standard for Awarding Benefits**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §§ 404.1505(a), 416.905(a).[4] An impairment is "medically determinable" if it results from anatomical, physiological, or

---

[4] Disability Insurance Benefits (*see* 42 U.S.C. §§ 401, et seq.) and Supplemental Security Income (*see* 42 U.S.C. §§ 1381, et seq.) are separate programs under Title II and Title XVI, respectively, of the Social Security Act. Although they are subject to different qualification requirements, the standard for determining whether a claimant is disabled is the same for both programs. *See Rutherford v. Barnhart*, 399 F.3d 546, 551 n.1 (3d Cir. 2005) (citation omitted). The Court endeavors to provide citations to the applicable regulations for each program but may provide citations only to the disability insurance benefits regulations. *See Carmon v. Barnhart*, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (explaining that because "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and [supplemental security income]," "[w]e provide citations only to the regulations respecting disability insurance benefits").

psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id.* §§ 404.1521, 416.921.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id.* §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id.* §§ 404.1572(a) & (b), 416.972(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. *Id*. §§ 404.1522, 416.922. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id*. §§ 404.1526(b)(2), 416.926(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id*. §§ 404.1560, 404.1565,

416.945, 416.960.  If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations.  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Id*. §§ 404.1569a(a) & (b), 416.969a(b).  Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing postural or manipulative functions such as reaching, stooping, climbing, crawling, crouching, handling, or fingering; difficulty tolerating environmental or physical features of certain work settings such as dust or fumes; or difficulty maintaining concentration or understanding detailed instructions.  *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2.  20 C.F.R. §§ 404.1569a(b), 416.969a(b).  The Grid Rules reflect various combinations of RFC, age,

education, and work experience, and direct a finding of disabled or not disabled for each combination.  If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations.  *Id*. §§ 404.1569a(d), 416.969a(d).  If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making.  *Id*. §§ 404.1569a(c), 416.969a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was forty-nine years old on March 28, 2014 (amended alleged onset date), and his date last insured December 31, 2017.  (R. 13, 19.)  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date.  (R. 13.)  At Step Two, the ALJ found that Plaintiff had the following severe impairments:  diabetes mellitus, hypertension, and alcohol abuse.  (R. 13.)  The ALJ also found at Step Two that Plaintiff had the following impairments that are not severe:  hyperlipidemia, chronic obstructive pulmonary disease, and coronary artery disease.  (R. 14.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing.  (R. 14.)  At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform light work subject to various non-exertional limitations.  (R. 15-19.)  In so finding, the ALJ observed that "[w]hile it is quite possible that the claimant's inconsistent blood sugar control could further reduce his funcitonality in the future, the present medical record does not show that that has occurred."  (R. 18.)  The ALJ also found at Step Four that Plaintiff was unable to perform his past relevant work as a sheet metal worker.  (R. 19.)  At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rules 202.21 and 202.14 if Plaintiff had the RFC to

perform the full range of light work.  The ALJ also found at Step Five, using these Grid Rules as a framework and pursuant to Social Security Ruling 85-15, that jobs existed in significant numbers in the national economy that could be performed by an individual with Plaintiff's age, education, work experience, and RFC.  (R. 20.)  The ALJ concluded that Plaintiff was not disabled from the amended alleged onset date through February 12, 2016 (decision date).  (R. 20.)

Plaintiff's attack is multi-pronged.  First, Plaintiff contends that the ALJ's decision should be reversed under 42 U.S.C. § 405(g) pursuant to Sentence Four and remanded for payment of benefits or, alternatively, for a new hearing.  Plaintiff argues that the ALJ committed reversible error:  (1) at Step Four, because the RFC finding is not supported by substantial evidence (*see* ECF No. 15 at 16-26); and (2) at Step Five, because there was no VE testimony during the hearing (*see id*. at 26-37).[6]  Second, Plaintiff contends that even if the case is not reversed under Sentence

---

[6] The "Summary of Argument" and "The RFC For Light Work Is Not Based On Substantial Evidence" sections of Plaintiff's brief include complaints about the ALJ's Step Two and Step Three findings.  ECF No. 15 at 12, 15-16, 26.  At Step Two, Plaintiff complains that "peripheral neuropathy *is never acknowledged to constitute a severe impairment* even though the uncontradicted record shows, and the ALJ's [decision] accepts, the reality that plaintiff has 'decreased sensation of the soles of both feet and reflexes were absent at the patellae and Achilles' (Tr.14)."  *Id*. at 15 (emphasis in original).  The Court finds that any error at Step Two was harmless because the ALJ found that Plaintiff had other severe impairments and expressly considered peripheral neuropathy at Steps Three and Four (R. 14, 19).  *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("if the ALJ found in [the claimant's] favor at Step Two, even if [the ALJ] had erroneously concluded that some of [the claimant's] other impairments were non-severe, any error was harmless"); 20 C.F.R. § 404.1523(c) (ALJ must consider both severe and non-severe impairments at each Step).  At Step Three, Plaintiff complains that the ALJ failed to cite and apply Social Security Ruling 14-2p, *Titles II & XVI:  Evaluating Diabetes Mellitus*, 2014 WL 2472008 (S.S.A. Jun. 2, 2014).  (R. 15-16.)  The Court also finds that any error at Step Three was harmless.  The ALJ implicitly acknowledged Social Security Ruling 14-2p:

The [Commissioner] no longer evaluates endocrine disorders, such as diabetes mellitus, under Section 9.00 of the listed impairments, but rather focuses on the impairments, if any, which results from these disorders.  The undersigned must therefore evaluate the effects of these conditions under the listings for other body systems which the endocrine disorder impacts.

(R. 14.)  The ALJ considered Listing 11.14 (Peripheral Neuropathies), and Plaintiff does not "affirmatively point[] to specific evidence that demonstrates he should succeed" as to that – or any other – Listing.  *Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

Four, it should be reversed under 42 U.S.C. § 405(g) pursuant to Sentence Six and remanded for a new hearing based on additional evidence that was not before the ALJ. *See id.* at 37-39. Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. Defendant alternatively contends that the ALJ's decision should be reversed and remanded for a new hearing.

## IV.    SUMMARY OF RELEVANT EVIDENCE BEFORE ALJ

In August 2012, Plaintiff submitted a Function Report indicating that he lived in an apartment with his girlfriend and daughter. He used an insulin pump and glucose meter every day as prescribed by his doctors. His daily activities consisted of taking care of his family and looking for jobs. He had no problems with personal care but at times had difficulty sleeping. He cooked low carbohydrate and low sugar meals daily. He did not need any reminders to take his medication. Once a week, he spent a few hours doing household cleaning and laundry. He went outside once or twice a day and was able to do so by himself. He had a driver's license and drove a car. Twice a week, he spent a couple of hours shopping for food and household necessities. His hobbies included watching television and reading, although he often had difficulty seeing up close. His diabetes caused poor eyesight and numbness in his hands and feet, which adversely affected his ability to see, use his hands, stand, and kneel. He did not know how long he could walk before needing to stop and rest. He generally found it hard to do physical activities because of his diabetes. (R. 170-77.)

In January 2013, Plaintiff was evaluated by consultative examiner Dr. Joseph DiLallo (internist). (R. 393-400.) Plaintiff recited his medical history and advised that he smoked one

pack of cigarettes daily and had not had any alcohol for many months.  Dr. DiLallo summarized

the physical examination findings as follows:

> Regarding his diabetes – this has been quite unstable.  During the past year on several occasions, he called the paramedics and has ended up in the emergency room because of unstable blood sugar, either very low or very high.  The medication needed for his therapy is an insulin pump which gives variable doses as indicated by his blood sugar level.  He has some evidence for neuropathy in terms of decreased sensation in his soles of both feet which indicates peripheral neuropathy secondary to diabetes.

> As regards to peripheral vascular disease, he has no TP palpated, but the dorsalis pedis pulses are palpated at 2+/4+.  There is the possibility of a low-grade peripheral vascular disease.  Gait and station are good, and his dexterous movements are good.  General motor function seems good.  His ability to do fine and gross manipulation is adequate.  Grip strength is 5/5 right and left.  No generalized muscle weakness.  Gait and station are adequate in pace and balance, and he is not using any hand-held device for assistance in ambulation.

> With regard to his joints, he has no complaints of any joint pain at this time, and there are no motor, reflex, or neurological deficits except for which is mentioned in terms of his decreased sensation and probable peripheral neuropathy.

(R. 394-95.)  Dr. DiLallo opined:

> As regards to physical functioning, he can sit and stand for several hours.  He feels there is no serious problem in this area.  He can lift 10-20 lbs. as opposed to his previous ability to lift much heavier weight as part of his work.  He can carry probably 10 lbs. at this time.  He can bend, crouch squat, and stoop fairly well.  Vision is adequate.  He wears glasses for near and distance vision.  His hearing is within normal limits.  [As] to mental function – his concentration is fair with good persistence, pace, and memory.  He feels he can adapt to changes and respond to work stress, but he is concerned regarding the unstable blood sugars requiring multiple emergency medic situations.  He is either falling or getting loss of consciousness and has been found to have both low and very high blood sugar levels.  He has gone to the emergency room many times in 2012, probably 5-6 times at least.  He is afraid of going to high places during his work and possibly losing consciousness because of undetected erratic blood sugars.

> As regards to demonstrable activities of daily living, he is ambulatory.  He does his own toiletry, transferring bathing, feeding, dressing, and he is not incontinent bladder or bowel, but he does have a problem of frequency of urination and often times an associated urgency which he feels is getting progressively worse.

As regards to instrumental activities of daily living, he takes his own medications, does his own financing, telephoning, transportation (including driving).  He does his own shopping, meal preparation, and necessary housework.  It can be said he is very highly motivated to work.

Possibly vocational rehabilitation would give him access to a non-labor intensive danger free occupational situation.  He is "not trained for anything", but he feels he could probably work in a store or office if he has some extra training.  There is no doubt he needs a safe environment in which to work.

(R. 396.)[7]

Also in January 2013, State Agency reviewing consultants opined that Plaintiff had no exertional limitations; could never climb ladders, ropes, or scaffolds; must avoid all exposure to work hazards like machinery and heights; must avoid concentrated exposure to extreme heat/cold and vibration; and could never drive vehicles requiring a commercial driver's license.  (R. 50-57.) In March 2014, State Agency reviewing consultants affirmed on reconsideration their colleagues' initial opinion from January 2013.  (R. 69-80, 456.)

On March 28, 2014, Plaintiff was taken to the emergency room at Robert Wood Johnson University Hospital.  His A1C was 10.6  The admission record noted that Plaintiff had a "past medical history significant for diabetes as well as alcohol abuse."  (R. 459 ("He has chronic alcoholism.  He smokes half a pack to one pack per day.").)  Plaintiff was diagnosed with diabetic ketoacidosis, sepsis, pneumonia, and respiratory failure.  He was transferred to the ICU where he was intubated and started on an intravenous insulin and antibiotics drip.  (R. 459.)  On April 17, Plaintiff was discharged to an inpatient rehabilitation facility under the care of Dr. Pranab Haldar

---

[7] The only medical evidence in the record from 2012 relate to Plaintiff's admission to the Robert Wood Johnson University Hospital emergency department on June 5, 2012 for an apparent seizure.  His glucose level was 333.  Plaintiff told the ambulance drivers that he had been out drinking the previous night and had not taken his medications.  Plaintiff also stated that he drank between 5-15 alcoholic beverages per day but had not had any alcohol that day.  Hospital staff retrieved Plaintiff's medical records, which indicated that he was most recently treated in the emergency department on April 27, 2012 for diabetic ketoacidosis and alcohol withdrawal.  Plaintiff was released the same day with a diagnosis of recurrent hypoglycemia. (R. 357-86.)

(internist).  The facility's admission notes state that Plaintiff was independent as to daily living activities and ambulation prior to his March hospitalization.  The notes also state that, despite Plaintiff's assertion that he drank six beers per week, his chart "clearly documents current alcoholism."  (R. 470.)  On May 5, Dr. Haldar completed an Examination Report when Plaintiff was discharged from rehabilitation.  Dr. Haldar opined that Plaintiff was limited in his ability to climb, bend, and lift, and that Plaintiff could not work until July 2014 because he needed sixty days to recover from his recent hospitalization/rehabilitation.  (R. 471-75.)

On June 16, 2014, Plaintiff was taken to the emergency room at St. Michael's Medical Center for nausea and vomiting.  His glucose level of 900.  He was diagnosed with diabetic ketoacidosis and transferred to the ICU.  Plaintiff was discharged two days later on June 18 when his glucose level was below 200.  He was instructed to follow up at St. Michael's Primary Care Clinic.  (R. 485-86.)

In July 2014, Plaintiff underwent an initial evaluation by Dr. Arthur D. Siegel (internist).  Plaintiff reported fatigue, generalized weakness, and some numbness in his extremities.  Physical examination findings were normal except for some sensory deficit in the bilateral foot soles and fingertips.  He was counselled to stop drinking alcohol, and he was given referrals to an endocrinologist (Dr. Nicholas Baranetsky), a podiatrist (Dr. Gustav Ibranyi), and an ophthalmologist (Dr. Matthew Marano).[8]  (R. 552-63.)

On October 24, 2014, Plaintiff was taken to the emergency room at St. Michael's Medical Center for nausea, vomiting, and abdominal pain.  His glucose level was 1116, and his A1C was 9.1.  He was diagnosed with diabetic ketoacidosis and transferred to the ICU.  Plaintiff was

---

[8] There is no evidence in the record relating to Drs. Baranetsky, Ibranyi, or Marano.

discharged five days later on October 29 when his blood sugars were controlled.  He was instructed to follow up at St. Michael's Primary Care Clinic.  (R. 482-83.)

In December 2014, Plaintiff had a follow-up with Dr. Siegel.  Plaintiff stated that he continued to experience numbness and paresthesia in his extremities.  Physical examination findings were normal.  Dr. Siegel reviewed Plaintiff's blood sugar levels log and instructed him to continue with his prescribed insulin regime.  Dr. Siegel also diagnosed diabetic peripheral neuropathy and refilled a prescription for Neurontin that was originally prescribed in October 2014.[9]  (R. 535-45.)  Plaintiff saw Dr. Siegel for medication refills in January, February, March, and April 2015.  There are no physical examination findings in the treatment notes for these visits. Plaintiff was regularly advised by Dr. Siegel to stop smoking and drinking.  (R. 516-18, 520-21, 524-26, 531-32.)

On June 8, 2015, Plaintiff was taken to the emergency room at St. Michael's Medical Center for nausea and vomiting.  The ER admission notes reference Plaintiff's statements that he complied with his insulin, checked his blood sugar levels daily, and was recently drinking a lot more than usual.  He clarified that he was drinking two to three vodkas daily, including on his admission date.  His glucose level was 700.  Plaintiff was diagnosed with metabolic encephalopathy secondary to diabetic ketoacidosis, and he was transferred to the ICU.  Among Plaintiff's secondary diagnoses was chronic continuous alcohol dependence and abuse.   He was given intravenous insulin and fluids, and he was also put on a Librium protocol secondary to possible alcohol withdrawal.  He was discharged three days later on June 11 when his blood sugar levels were controlled.  His discharge medications included insulin (diabetes), Neurontin (diabetic neuropathy), and multivitamins/thiamine (alcohol abuse).  He was instructed to follow up at St.

---

[9] There are no records from Dr. Siegel for the period between July and December 2014.

Michael's Primary Care Clinic, to follow a strictly diabetic diet, and to attend programs at the Diabetes Education Center. He was also counseled on cessation of alcohol; Plaintiff stated that he would attempt to stop but made no promises. (R. 477-78.)

On June 15, 2015, an MRI of Plaintiff's brain revealed a four millimeter focus of diminished enhancement in the pituitary gland which may be due to microadenoma. (R. 487.) In June and September 2015, Plaintiff saw Dr. Siegel for medication refills. There are no physical examination findings in the treatment notes for these visits. Plaintiff was regularly advised by Dr. Siegel to stop smoking and drinking. (R. 507-09, 512-13.)

In November 2015, Plaintiff was questioned during the hearing by both his counsel and the ALJ. (R. 31-44.) Plaintiff testified that he previously worked as a commercial and residential sheet metal worker. In May 2014, he moved to a homeless shelter at the Newark YMCA. His typical day was boring. Sometimes he took the bus to Rahway to pick up his (then 7-year old) daughter from school and walk her to her mother's house. There were no cooking facilities at the shelter; he used food stamps and ate at soup kitchens. He was first diagnosed with diabetes in 2005 and began taking insulin in 2007. An insulin pump was implanted in 2010 but was removed in March 2014 because his blood sugar levels were too volatile. He did not change his insulin dosage unless instructed to do so by a physician; he noted that the dosage had been lowered several weeks before the hearing. He checked his blood sugar levels at least three times a day. The previous day, Plaintiff's morning glucose level was 500, and he vomited all day. He administered insulin throughout the day and awoke this morning with a glucose level of 117. When asked how often he vomited because of a high blood sugar level, he testified that it had occurred with more frequency over the last year and had resulted in several hospitalizations.

Plaintiff also testified during the hearing that his diabetes caused neuropathy in his bilateral upper and lower extremities, with bad cramps in the hands, arms, legs, and feet.  These symptoms were not constant.  Pain started in his feet and shot up through his legs.  He could not stand for more than one hour, and his ability to walk was sometimes limited.  His fingers were always numb, and pain occasionally shot up through his arms.  He had difficulty picking up small things and tying his shoes; he did not write much.  He needed reading glasses and experienced vision changes from time to time.  His primary doctor was Dr. Siegel, and his endocrinologist was Dr. Ibrehani. Both doctors are located at St. Michael's Medical Clinic, and he had monthly appointments with each of them.  He participated in the St. Michael's Diabetes Management Program and was scheduled to wear a sensor for five days to monitor his blood sugar levels on a continuous basis. His daily medications included insulin (for diabetes), blood pressure and cholesterol pills (for hypertension), and two inhalers (for COPD).  He last drank heavily about a year ago, when he was advised that it would exacerbate his diabetes.  He did not notice any change in his condition since he stopped drinking.  He testified that he used to think the medications made him feel tired and lethargic but has been told those symptoms were caused by a small tumor in his pituitary gland that was being monitored for growth.

A Certified Earnings Record reflects that Plaintiff worked as a sheet metal worker from 1997 through 2009.  He had no income in 2010 and 2011.  He earned approximately $15,000 in 2012, $11,000 in 2013, and $7,000 in 2014.  He had not worked since his hospitalization in March 2014.  (R. 142-48.)

## V.    DISCUSSION

### A.    Local Civil Rule 9.1(e).

The Local Rules for this District require that a plaintiff's brief in a Social Security disability appeal include a separate "statement of facts with reference to the administrative record."  L. Civ. R. 9.1(e)(5)(C).  Plaintiff's thirty-nine page brief contains a one-paragraph section entitled "Procedural History/Statement of Facts" that contains a brief procedural history of Plaintiff's administrative claim but no statement of facts whatsoever.  ECF No. 15 at 1-2; *see id*. at 3-39 (containing few, if any, record citations other than to the ALJ's decision).  Moreover, Plaintiff's brief fails to comply in other respects with Local Civil Rule 9.1(e)(5).  For example, there is no meaningful "statement of the issues presented for review."  L. Civ. R. 9.1(e)(5)(A); *see* ECF No. 15 at 2 (one-sentence section entitled "Issue" stating only that "[t]he primary determination for this Court is whether the Commissioner's decision is supported by substantial evidence").  As another example, there is no argument "divided into sections separately treating each issue."  L. Civ. R. 9.1(e)(5)(D); *see* ECF No. 15 at 12, 15-16, 26 (challenging ALJ's Step Two and Step Three findings both in the "Summary of Argument" and in an argument section purportedly challenging the ALJ's RFC finding).  An additional failing is that counsel's arguments are routinely unnecessarily caustic.

Since May 4, 2018, the undersigned has decided twenty-four Social Security disability appeals in which the plaintiff was represented by Plaintiff's counsel in the present case.  The plaintiff's brief in each of those cases has had similar failings.  It is not the Court's burden to sift through Plaintiff's muddled arguments to determine the bases for appeal and then comb through the record searching for support.  Plaintiff's counsel, the law firm of Langton & Alter, Esqs., has been notified that any brief filed after May 13, 2019 that does not comply with Local Civil

9.1(e) will be rejected, and any fees for re-briefing will not be credited when considering the reasonableness of fees for successful appeals. *See Little v. Berryhill*, No. 2:17-cv-11708 (PAZ), 2019 U.S. Dist. LEXIS 82127, at *44-46 (D.N.J. May 13, 2019). The Court reiterates such notification. The Court will consider the effect, if any, that Plaintiff's counsel's failure to comply with Local Civil Rule 9.1(e) (and the corresponding burden placed on the Court) should have on any award of fees in this case and will adjust those fees accordingly.

### B.    Sentence Four:  Step Four.

At Step Four, the ALJ found:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he cannot climb ladders ropes or scaffolds. The claimant must avoid concentrated exposure to extreme cold, extreme heat, and vibrations. He must avoid all exposure to dangerous machinery and unprotected heights.

(R. 15.)[10]  Plaintiff contends that the RFC finding was not supported by substantial evidence because:  (1) the ALJ erroneously weighed the medical opinions of the State Agency reviewing consultants, and Drs. Haldar and DiLallo; and (2) the ALJ erroneously assessed Plaintiff's subjective symptoms. The Court disagrees.

### 1.    Medical Opinions.

When evaluating medical evidence, an ALJ must give controlling weight to, and adopt the medical opinion of, a treating physician if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir.

---

[10] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 CFR § 404.1567(b). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling 83-10, *Titles II & XVI:  Determining Capability To Do Other Work – The Medical-Vocation Rules Of Appendix 2*, 1983 WL 31251, at *6 (S.S.A. 1983).

2000) (treating physician rule is "cardinal principle" guiding disability determinations). "[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317. The treating physician rule applies only to opinions that reflect judgments about the nature and severity of a claimant's impairment, including the claimant's symptoms, diagnosis and prognosis, what s/he can still do despite impairment, and his/her physical or mental restrictions. 20 C.F.R. § 404.1527(a). A treating physician "opinion" that the claimant is disabled and unable to work can never be given controlling weight, because that is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Even where the treating physician's medical opinion is not required to be given controlling weight, the opinion still may be entitled to some deference based on the ALJ's consideration of the following factors, which the ALJ must also consider when considering opinions from non-treating physicians: length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the source. 20 C.F.R. § 404.1527(c)(2)-(6); *see Plummer*, 186 F.3d at 429 (ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided"). The ALJ is not required to adopt all limitations assigned by a medical opinion, even if the ALJ assigns the medical opinion significant weight. *See Wilkinson v. Comm'r of Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014).

Plaintiff argues that "[l]imitations assessed [by State Agency reviewing consultants] which would indicate disability are given little weight while positive findings are given great weight." ECF No. 15 at 20. Plaintiff is wrong. The ALJ ascribed little weight to the reviewing consultants'

opinion that Plaintiff could perform even medium and heavy work because he had no exertional limitations. The ALJ ascribed great weight to the remainder of the reviewing consultants' opinion that: Plaintiff could never climb ladders, ropes, or scaffolds; must avoid all exposure to hazards such as machinery and heights; and must avoid concentrated exposure to extreme cold, extreme heat, and vibration. (R. 19.) The ALJ therefore excluded only limitations opined by the reviewing consultants that were *less* restrictive than the ALJ's finding. Put another way, the reviewing consultants opined that Plaintiff could perform *more* work activities than the ALJ found. As Plaintiff's counsel well knows, that the ALJ did not share the reviewing consultants' opinion in this regard is – from his client's perspective – anything but erroneous.

Dr. Haldar opined in May 2014 at the end of Plaintiff's inpatient rehabilitation treatment that Plaintiff could not work; was limited in climbing, bending, and lifting; and was a likely candidate for supplemental security income. The Court finds that Dr. Haldar's opinion cannot be given controlling weight because it addresses a subject that is exclusively within the ALJ's purview. The Court further finds that the ALJ did not err by ascribing little weight to this opinion. First, Dr. Haldar opined that Plaintiff would be disabled for less than 90 days, which fails to satisfy the Commissioner's 12-month duration requirement. 20 C.F.R. § 404.1505(a). Second, as the ALJ accurately described, "this opinion is vague and does not specify exactly how the claimant's climbing, bending or lifting is limited." (R. 18.) The Court therefore finds that the ALJ's assessment of Dr. Haldar's opinion was supported by substantial evidence.

As to Dr. DiLallo's January 2013 consultative examination, the ALJ explained:

Upon examination, the claimant exhibited decreased sensation of the soles of both feet and reflexes were absent at the patellae and Achilles. The claimant had good balance, coordination, and adequate gait and station. The claimant's extremities were normal including strength and range of motion. DP pulses were palpable at 2/4+ but not the TP. Dr. DiLallo felt there was a possibility of low-grade peripheral vascular disease. Dr. DiLallo diagnosed the claimant with type I diabetes mellitus

with unstable control including neuropathy and suspicion of peripheral vascular disease, and hypertension with reasonable control.

(R. 16.)  Dr. DiLallo opined that Plaintiff could sit and stand for several hours; lift 10-to-20 pounds; and could bend, crouch, squat, and stoop fairly well.  The ALJ found:

> With regard to the claimant's physical limitations, this opinion is consistent with the comprehensive physical examination findings.  Moreover, there is nothing in the remaining medical evidence of record to contravene Dr. DiLallo's findings or opinion.  In fact, almost every other physical examination in the record showed no abnormalities.  Therefore, this portion of the opinion is given great weight.

(R. 18-19.)[11]  As best the Court can discern from Plaintiff's disjointed brief, he argues that the ALJ should have ascribed less weight to Dr. DiLallo's opinion because it is "dubious" that someone with "absolutely no feeling in the bottom of his feet and absolutely no reflexes whatsoever from his knees down to his heels" could stand and walk up to a total of six hours in an eight-hour workday with regular breaks.  ECF No. 15 at 15.  The lay opinion of Plaintiff's counsel is not evidence.  Dr. DiLallo is a medical professional whose opinion is consistent with Plaintiff's stated belief that he could work in a store or office with appropriate training.  Dr. DiLallo's opinion is also consistent with Plaintiff's employment history as a sheet metal worker, which reflects – notwithstanding the numbness in his lower extremities – that he exceeded the substantial gainful activity threshold in 2012 and was just short of the threshold in 2013.  Dr. Seigel diagnosed Plaintiff as having peripheral neuropathy secondary to diabetes even though the treatment notes do not reflect any corresponding physical findings.  Dr. Seigel did not opine that Plaintiff had any resulting functional limitations.  Nor is there any evidence that any other medical professional who treated Plaintiff's diabetes and associated impairments opined that Plaintiff had any resulting

---

[11] Since Plaintiff's mental health was outside the scope of Dr. DiLallo's expertise, the ALJ ascribed little weight to Dr. DiLallo's opinion that Plaintiff's concentration was fair, his attention was generally good, and he had good persistence, pace and memory.  (R. 19.)  Plaintiff does not dispute the ALJ's assessment of Dr. DiLallo's opinion in this regard.

limitations.  Despite Plaintiff's representations that he saw an endocrinologist monthly, there are no treatment notes in the record.  Moreover, none of the doctors who examined Plaintiff during his hospitalizations suggested that he had any functional limitations when he was not suffering from ketoacidosis.  (R. 14.)  The Court therefore finds that the ALJ's assessment of Dr. DiLallo's opinion was supported by substantial evidence.

### 2. Subjective Symptoms.

"Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make."  *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).  The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process.  *See* 20 C.F.R. § 416.929.  First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms.  To do this, the ALJ must determine if objective medical evidence alone supports the claimant's complaints; if not, the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, *Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).[12]

After noting that Plaintiff's subjective symptoms were considered in accordance with the requirements of Social Security Ruling 96-7p, the ALJ recited the two-step standard above and concluded that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 18.) The ALJ explained:

> The claimant testified that he experiences neuropathy and pain in the hands, legs and feet, can stand for 60 minutes, becomes short of breath when walking, and neuropathy affects his fingers and hands by cramping. The claimant testified that he is under the care of an endocrinologist, but those records are not available for review. The record supports the claimant's testimony that his blood sugars vary widely. However, the record also supports that certain episodes of ketoacidosis coincide with the claimant's increase in alcohol abuse. Moreover, despite the claimant's complaints of shortness of breath, he continues to smoke. Other than the consultative examination, where Dr. DiLallo documents the claimant's decreased sensation in the soles of his feet and decreased reflexes, none of the claimant's other physical examinations in the record support these claims of numbness and tingling in the extremities. Furthermore, despite the claimant's testimony that neuropathy in his hands adversely affects his ability to handle small items, the claimant exhibited 5/5 grip strength.
>
> Moreover, the claimant is able to engage in a wide range of activities of daily living. The claimant reported that he prepares meals, does cleaning and laundry, drives, shops in stores, watches TV, and reads. Overall, the record revealed only conservative medical treatment with no medical evidence that would contravene the thorough consultative examination findings. While it is quite possible that the claimant's inconsistent blood sugar control could further reduce his functionality in the future, the present medical record does not show that that has occurred.

---

[12] Social Security Ruling 96-7p applies to SSA decisions that, like the ALJ decision in this case, were made prior to March 28, 2016.

(R. 18.)  Plaintiff argues that none of the bases for the ALJ's credibility finding "is accurate."  ECF No. 15 at 24.  The Court disagrees.

Plaintiff complains that "Dr. DiLallo did not report anything close to a 'normal physical examination'."  ECF No. 15 at 24.  But the ALJ's decision expressly considered each of the "abnormal" findings that Plaintiff identifies from Dr. DiLallo's report (i.e., decreased sensation, absent reflexes, decreased or absent pulses).  Indeed, the ALJ included non-exertional limitations in the RFC finding based on "the claimant's complaints of bilateral lower extremity numbness and Dr. DiLallo's finding of decreased sensation and reflexes in the lower extremities."  (R. 19.)

Plaintiff also complains that the ALJ characterized Plaintiff as receiving "conservative medical treatment" and engaged in "willfully obtuse fact finding" by "concluding that [Plaintiff's] condition is as it was in January, 2013, notwithstanding absolute knowledge that it deteriorated over the remaining 2+ years."  ECF No. 15 at 24-25.  This is harsh and misleading criticism.  The ALJ noted that Plaintiff underwent outpatient physical examinations only on three occasions – in January, October and February 2014 – after Dr. DiLallo's examination.  The remainder of Plaintiff's outpatient medical care during this period consisted of appointments to review laboratory bloodwork and refill prescriptions.  Plaintiff was routinely instructed at those appointments to take his medications as directed, stop smoking, and remain sober.  The only treatment Plaintiff received for his alleged neuropathy was a Neurontin prescription beginning in October 2014.  The ALJ cannot be faulted for failing to cite examination findings and treatments that never occurred.  As to Plaintiff's inpatient care, the ALJ expressly considered the four hospitalizations – March, June, and October 2014; and June 2015 – that occurred after Dr. DiLallo's examination.  The ALJ's finding that Plaintiff was able to perform light work (subject to non-exertional limitations) during this period is supported, among other things, by:  Plaintiff's

ability to satisfy the substantial gainful activity threshold in 2012 despite five to six alleged hospitalizations; Plaintiff's belief in January 2013 that he could work in an office or store despite being hospitalized five to six times the previous year; and Plaintiff's just missing the substantial gainful activity threshold in 2013 (when he alleged no hospitalizations notwithstanding his 2012 medical history).

> Plaintiff further complains:

> [T]he ALJ just throws in alcoholism as window dressing for a light RFC and the rejection of [Plaintiff's] testimony.  Alcohol is insinuated as hovering over the evidence but no finding is generated and the decision doesn't dare state that absent alcohol, [Plaintiff's] illness might have been kept under control.

ECF No. 15 at 24.  This, too, is harsh and misleading criticism.  Plaintiff did not require hospitalization simply because he had diabetes.  He was hospitalized because he developed ketoacidosis from high blood sugar levels.  The ALJ accurately observed, as documented in the emergency department records, that at least three of Plaintiff's four episodes of ketoacidosis during the alleged disability period coincided with an increase in alcohol abuse.  Plaintiff testified during the November 2015 hearing that he was advised by doctors not to drink alcohol because it would adversely impact his blood sugar levels.  Plaintiff's medical records are replete with instructions to avoid alcohol; he did not.  For example, although Plaintiff testified during the November 2015 hearing that he had not consumed any alcohol over the past year, Plaintiff told emergency department doctors in June 2015 that he was drinking two to three vodkas daily.  He told rehab facility doctors in April 2014 that he drank six beers a week, but they noted that his longitudinal record "clearly documents current alcoholism."  (R. 470.)  Social Security Ruling 96-7p provides that a claimant's statements may be less credible "if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  S.S.R. 96-7p, 1996 WL 374186, at *7.  Plaintiff offers no good reason for his failure to

follow medical instructions to remain sober.  The Court finds no error in the ALJ's consideration of Plaintiff's failure to avoid alcohol consumption in assessing the credibility of Plaintiff's testimony about his pain, his ability to stand or walk, and the frequency with which his blood sugar levels were so uncontrolled that he required hospitalization for ketoacidosis.  The Court therefore finds that substantial evidence supports the ALJ's assessement of Plaintiff's subjective symptoms.

### C.    Sentence Four:  Step Five.

The ALJ's Step Five analysis began by finding that the Grid Rules could be used a framework for decision-making because Plaintiff could perform of all or substantially of the exertional demands of light work but was subject to non-exertional postural and environmental limitations.  Relying on Social Security Ruling 85-15, the ALJ found that Plaintiff was not disabled because the non-exertional limitations have little or no effect on the occupational base of unskilled light work.  (R. 20.)  Plaintiff argues that the ALJ committed reversible error:  (1) by failing to rely on VE testimony; (2) by failing to provide notice of intention to rely on Social Security Ruling 85-15 in lieu of VE testimony; and (3) by relying on Social Security Ruling 85-15.[13]  The Court rejects Plaintiff's first two arguments but agrees with his third argument.

### 1.    Grid Rules.

Plaintiff argues that "the vocational rules alone or applied in 'framework' have no relevance to this case and cannot be utilized in any form to carry the Commissioner's step 5 burden" because Plaintiff had no non-exertional *impairments*.  ECF No. 15 at 14 ("[i]n view of this reality a vocational expert was necessary at step 5").  It is not surprising that Plaintiff provides

---

[13] Plaintiff restates in this section of his brief arguments that the RFC finding fails to include all his credibly established limitations.  *See* ECF 15 at 33-36.  Since the Court has found that the ALJ's RFC determination supported by substantial evidence, the Court need not address Plaintiff's remaining arguments.  *See Rutherford v. Barnhart,* 399 F.3d 546, 554 n.8 (3d Cir. 2005).

no legal authority for this argument. The Grid Rules are used in connection with a claimant's RFC as expressed in terms of exertional and non-exertional *limitations* – regardless of whether the underlying impairments that result in such limitations are exertional or non-exertional. *Accord Morales v. Astrue*, No. 07-cv-01549 (VBK), 2008 WL 4394177, at \*3-4 (C.D. Cal. Sep. 8, 2008) (rejecting argument that use of Grid Rules was inappropriate for Plaintiff with severe impairment of diabetes mellitus and RFC to perform medium work subject to various postural and environmental limitations). Having found that Plaintiff's RFC allowed him to perform all the exertional demands of light work subject to non-exertional postural and environmental limitations, the ALJ was required to use the Grid Rules as a framework. The Court therefore finds that the ALJ did not err in this regard.

### 2. Notice.

Plaintiff argues that the ALJ erred by failing to inform Plaintiff's former counsel of the intention to rely on Social Security Ruling 85-15 in lieu of VE testimony. *See* ECF No. 15 at 36. Acquiescence Ruling 01-1(3) provides that when the Commissioner relies on a Social Security Ruling in finding that a non-exertional limitation does not significantly erode a claimant's occupational base, the Commissioner must provide the claimant with notice and an opportunity to respond. A.R. 01-1(3), *Sykes v. Apfel; Using The Grid Rules As A Framework For Decisionmaking When An Individual's Occupational Base Is Eroded By A Nonexertional Limitation – Titles II & XVI*, 2001 WL 65745, at \*4 (S.S.A. Jan. 25, 2001). Acquiescent Ruling 01-1(3) also includes an exception to the notice requirement if the Commissioner (1) relies on a Social Security Ruling that includes a statement explaining how the non-exertional limitation at issue affects the claimant's occupational job base, and (2) includes a citation to the Social Security Ruling in the disability determination. *Id.* This exception was reviewed in *Allen v. Barnhart*, 417 F.3d 396 (3d Cir. 2005),

a case in which the claimant was represented by Plaintiff's counsel in this case. The Third Circuit held:

> We think it only appropriate to give close scrutiny to the ALJ's reliance on a [Social Security] Ruling as satisfying the Commissioner's burden at Step 5 where the Commissioner has not previously advised or argued the clear applicability of the Ruling in advance of the hearing. In this way, while the Commissioner has the ability to satisfy its burden in this way, its doing so does not constitute an ambush whereby the claimant, who assumed he would have the opportunity to cross-examine a vocational expert, is left as a practical matter to merely argue against a Ruling in response to the Commissioner's proof.

*Id*. at 408; *see id*. at 407 ("if the [ALJ] wishes to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the non-exertional limitations impact the ability to work, and thus, the occupational base"); *Breslin v. Comm's of Soc. Sec.*, 509 F. App'x 149, 155 (3d Cir. 2013) (affirming despite lack of notice because ALJ's reliance Social Security Ruling passed close scrutiny). Thus, Plaintiff's counsel well understands that the ALJ's failure to provide notice does not, by itself, constitute reversible error.

### 3.    Social Security Ruling 85-15.

The ALJ concluded that Plaintiff's non-exertional limitations – never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme cold, extreme heat, and vibrations; and avoid all exposure to dangerous machinery and unprotected heights – "would have little or no effect on the occupational base of unskilled light work" based on Social Security Ruling 85-15. (R. 20 (citing S.S.R. 85-15, *Titles II & XVI:  Capability To Do Other Work – The Medical-Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments*, 1985 WL 56857 (S.S.A. 1985)).)  The ALJ specifically found:

> S.S.R. 85-15 provides that when a person has some limitation in climbing, and it is the *only* limitation, it would not ordinarily have a significant impact on the broad world of work. Moreover, this S.S.R. states that a person who is restricted *only* from being on unprotected elevation and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant

> effect on the work that exists at all exertional levels.  Finally, S.S.R. 85-15 states
> that few occupations in the *unskilled, sedentary* occupational base requires work in
> environments with extreme cold, extreme heat and vibration, and a need to avoid
> all exposure to these conditions would not, *by itself*, result in a significant erosion
> of the occupational base.

(R. 20 (emphases added).)  Applying close scrutiny to the ALJ's findings, the Court finds that

remand is warranted because the ALJ did not sufficiently explain how Social Security Ruling 85-

15 is probative as to the impact of Plaintiff's non-exertional limitations.  The first two sentences

of the ALJ's specific findings accurately recite Social Security Ruling 85-15 but are not probative

because neither climbing nor avoiding unprotected elevation and dangerous machinery is

Plaintiff's *only* non-exertional limitation.  *See Rzonca v. Colvin*, No. 14-cv-00003 (RMB), 2015

WL 71154, at *8 (D.N.J. Jan. 6, 2015) (instructing ALJ to consider this issue on remand) (citing

S.S.R. 85-15, 1985 WL 56857, at *6).  The last sentence of the ALJ's specific finding is not an

accurate recitation.  To the contrary, Social Security Ruling 85-15 provides that "[w]here an

individual can tolerate very little noise, dust, etc., the impact on the ability to work would be

considerable because very few job environments are entirely free of irritants, pollutants, and other

potentially damaging conditions."  S.S.R. 85-15, 1985 WL 56857, at *8 (mentioning extreme

temperature only as an example of an environmental limitation).

　　　The Court observes that Social Security Ruling 96-9p appears to contain the language that

the ALJ erroneously attributed to Social Security Ruling 85-15.[14]  Given the procedural posture of

this case, the Court finds that remand still would be warranted even if the ALJ had used the

correction citation.  First, the cited language contemplates a *single* non-exertional limitation that

---

[14] *See* Social Security Ruling 96-9p, *Titles II & XVI:  Determining Capability To Do Other Work – Implications Of A Residual Functional Capacity For Less Than A Full Range Of Sedentary Work*, 1996 WL 374815, at *9 (S.S.A. Jul. 2, 1996) (explaining that "few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards" – and that "[e]ven a need to avoid all exposure to these conditions would not, by itself, result in significant erosion of the occupational base").

avoids all exposure to extreme cold, extreme heat, and vibration – but Plaintiff has additional non-exertional limitations.  Second, the cited language references *unskilled* work, but the ALJ found that Grid Rules 202.21 and 202.14 – which apply to skilled or semi-skilled skills – would apply if Plaintiff had no non-exertional limitations.  Third, the cited language references *sedentary* work, but Plaintiff argues that the Grid Rules "would direct a determination of disability beginning at least as of August 2014" when Plaintiff turned fifty years old.[15]  ECF No. 22 at 3.  All three issues require additional explanation should the ALJ on remand seek to rely on Social Security Ruling 96-9p.

### D.    Sentence Six.

"[A] district court 'cannot look to evidence never presented to the ALJ in determining whether that decision was supported by substantial evidence[.]'"  *Miller v. Comm'r Soc. Sec.*, 732 F. App'x 162, 165 (3d Cir. 2018) (quotation omitted); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) ("The correctness of [the ALJ's] decision depends on the evidence that was before him.  He cannot be faulted for having failed to weigh evidence never presented to him.").  When a claimant seeks to rely on evidence that was not presented to the ALJ, a district court may remand the case under Sentence Six of 42 U.S.C. § 405(g) if the claimant can demonstrate that (1) the evidence is new, (2) good cause exists for not presenting the evidence to the ALJ in a timely manner, and (3) the evidence is material.  *See Matthews*, 239 F.3d at 592-92; *Strelec v. Colvin*, No. 5-cv-3010 (JLL), 2016 WL 2736103, at *8 (D.N.J. May 11, 2016).  The claimant bears the

---

[15] The Court expresses no opinion as to the potential applicability of the Grid Rules if Plaintiff were limited to sedentary work.  That is an issue for the ALJ and may require additional findings regarding whether Plaintiff had direct entry into skilled work after high school graduation and/or whether Plaintiff had transferrable skills.

burden of demonstrating that all three elements are satisfied.  *See Szubak v. Sec'y of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984).

On February 12, 2016, the ALJ issued his decision.  That same day, Plaintiff was admitted to St. Michael's Medical Center, and later that day he died.  The causes of death listed on his death certificate were diabetic ketoacidosis; diabetes mellitus; COPD; and history of alcohol abuse with intermittent periods of sobriety.  *See* ECF No. 15 at 40 (copy of death certificate).  Plaintiff's counsel contends that remand is warranted for the ALJ to consider Plaintiff's final hospitalization records and death certificate.  *See id*. at 39.  Defendant agrees, as does the Court.  The evidence is new because it was not previously entered into evidence and is not merely cumulative of what is already in the record.  *See Szubak*, 745 F.2d at  833.  The coincidence that Plaintiff was hospitalized and died on the day that the ALJ's decision was issued constitutes good cause for Plaintiff not previously presenting the evidence to the ALJ.  The evidence is material because "it cannot be said that there is no possibility that [Plaintiff's final hospitalization records and death certificate] would have changed the outcome of the [ALJ's] decision."  *Id*.; *see Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985) (materiality standard for new evidence on Sentence Six remand is "not great" and need not satisfy preponderance test).

V.    **CONCLUSION**

The Court is not unmoved by Plaintiff's untimely death and the pendency of his DIB application for nearly seven years.  However, for the reasons explained in this opinion, the Court cannot find that further administrative proceedings would simply prolong the wait for Plaintiff's estate by delaying an ultimate payment of benefits, because substantial evidence does not support a finding that Plaintiff was disabled between March 28, 2014 and February 12, 2016.  The Court reverses the ALJ's decision that Plaintiff was not disabled and remands the case to the

Commissioner pursuant to Sentences Four and Six of 42 U.S.C. § 405(g) for further proceedings in accordance with the preceding instructions and the accompanying Order.


Dated:   June 4, 2019                          _____s/ Paul A. Zoss_____
At Newark, New Jersey                      PAUL A. ZOSS, U.S.M.J.